**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| TWEETER OPCO, LLC., et al., | ) | |
| | ) | Case No.. 08-12646 (MFW) |
| | ) | |
| Debtors. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| ANDREW D'AMICO, ERIC WELTER | ) | |
| and FRANKLIN HEMMINGS on their | ) | |
| own behalf and on behalf of | ) | |
| all other persons similarly | ) | |
| situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Adversary No. 08-51800 (MFW) |
| v. | ) | |
| | ) | |
| TWEETER OPCO, LLC, and | ) | |
| SCHULTZE ASSET MANAGEMENT, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**MEMORANDUM OPINION**[1]

Currently before the Court are cross-motions for summary judgment on claims arising under the Worker Adjustment and Retraining Notification Act (the "WARN Act"). The question presented is whether Schultze Asset Management, LLC ("SAM") is liable with the Debtor as a single employer for the alleged WARN Act violations.

---

[1] This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

I.    <u>BACKGROUND</u>

Tweeter Opco, LLC (the "Debtor") filed a voluntary petition under chapter 11 on November 5, 2008.  The Plaintiffs commenced this class action adversary proceeding the same day.  The Plaintiffs' class consists of former employees of the Debtor who were fired without the sixty-days' written notice required by the WARN Act.  29 U.S.C. § 2102(a) ("An employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice . . . .").  The Plaintiffs assert that SAM is an "employer" liable with the Debtor under the WARN Act.

The Debtor's bankruptcy case was subsequently converted to chapter 7.  The Court approved a stipulation staying the proceeding against the Debtor but continuing it as to SAM.

Cross motions for summary judgment were filed raising the following issues: (1) whether SAM and the Debtor are a single employer under the WARN Act, (2) if SAM and the Debtor are a single employer, whether SAM is entitled to the faltering company exception available under the WARN Act, and (3) whether the Debtor acted in good faith, thereby precluding damages under the WARN Act.

Notices of completion of briefing on the cross-motions for summary judgment were filed and the matter is ripe for decision.

II.   JURISDICTION

The Court has core subject matter jurisdiction over this
adversary proceeding.  28 U.S.C. §§ 1334(b) & 157 (b)(2)(A), (B)
& (O).


III.  DISCUSSION

A.   Summary Judgment Standard

Summary judgment is proper if there is no genuine dispute
over any material fact and if, viewing the facts in the light
most favorable to the non-moving party, the moving party is
entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);
Fed. R. Bankr. P. 7056.  See also Celotex Corp. v. Catrett, 477
U.S. 317, 322 (1986).

The movant bears the burden of establishing that no genuine
disputes as to any material fact exist.  See Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10 (1986).
A fact is material when it could "affect the outcome of the
suit."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252
(1986).  Once the moving party establishes a prima facie case in
its favor, the opposing party must go beyond the pleadings and
identify specific facts showing more than a scintilla of evidence
that a genuine dispute of material fact exists.  See, e.g.,
Anderson, 477 U.S. at 252; Matsushita, 475 U.S. at 585-86;
Michaels v. New Jersey, 222 F.3d 118, 121 (3d Cir. 2000).

3

The filing of cross-motions for summary judgment does not alter the Court's analysis. "The [C]ourt must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure, § 2720, at 23 (1983). See also Wells Fargo Bank, N.A. v. Am. Home Mortg. Inv. Corp. (In re Am. Home Mortg., Inc.), No. 07-51741, 2008 Bankr. LEXIS 2805, at *12 (Bankr. D. Del. Oct. 30, 2008).

    B.   The WARN Act

        1.   Prima Facie WARN Act Violation

Under the WARN Act, a covered employer cannot close a plant or conduct mass layoffs of at least fifty employees before the end of a sixty-day period that begins to run only when the employer serves sufficient written notice of the upcoming plant closing or mass layoffs to each employee or the employees' representative. 29 U.S.C. § 2102(a).

To state a prima facie WARN Act claim in this action, the Plaintiffs must establish that (a) the Debtor was an "employer" covered under the WARN Act; (b) the Debtor's corporate headquarters (40 Pequot Way, Canton, Massachusetts) and the adjacent building (10 Pequot Way) constituted a "single site of

4

employment" under the WARN Act;[2] (c) the permanent shutdowns of
the Massachusetts and Pennsylvania facilities caused at least
fifty employees from each site to suffer an "employment loss";
and (d) the WARN Act's mandatory sixty-day written notice was not
provided to each "affected employee."

### a.   Employer

An "employer" is defined by the WARN Act as any "business
enterprise" that employs 100 or more full-time individuals.  29
U.S.C. § 2101(a)(1); 20 C.F.R. § 639.3(a).  The parties agree
that the Debtor is a covered "employer" under the WARN Act.

### b.   Single Site of Employment

The parties dispute whether 40 and 10 Pequot Way constituted
a single site of employment.  SAM contends that they are not
because each location served completely different functions and
was referred to by different internal location codes.

The Plaintiffs argue that 40 and 10 Pequot Way do in fact
constitute a single site of employment because the two buildings
were contiguous.  The Plaintiffs note that the two buildings were
adjacent to each other at the end of a cul-de-sac and shared a
parking lot, a receptionist, IT equipment, and some departmental
offices.  SAM does not dispute these facts.

---

[2]  There is no dispute that the Debtor's location in
Norristown, Pennsylvania, also constituted a "single site of
employment."

Proximity and contiguity are the two most significant criteria in making single site determinations.  See Frymire v. Ampex Corp., 61 F.3d 757, 766 (10th Cir. 1995) ("[T]hese regulations suggest that proximity and contiguity are the most important criteria for making single site determinations."). When buildings are immediately proximate or contiguous, a single site is presumed.  See Kephart v. Data Systems Int'l., Inc., 243 F. Supp. 2d 1205, 1221 (D. Kan. 2003).  Here, this presumption is reinforced by the shared parking lot, IT equipment, and departmental offices.  The Court concludes that 40 and 10 Pequot Way constitute a single site of employment.

### c.    Number of Employees Terminated

SAM does not dispute that at least fifty employees were terminated at the Massachusetts facility.  SAM argues, however, that the shutdown at the Pennsylvania facility did not cause the loss of employment for fifty or more employees.

The Plaintiffs rely on the deposition of the Debtor's former Chief Executive Officer, George Granoff, who testified that "from May 1, 2008 until October 31, 2008, [the Debtor] employed at least 50 employees . . . at [the Pennsylvania] facility." (Granoff Dep. at 14:14-20.)  The Plaintiffs add that the Debtor's issuance of WARN Act notices (on the termination day) to employees terminated at the Pennsylvania facility is evidence that at least fifty employees worked at the facility.

6

In response, SAM quotes the deposition testimony of the Debtor's Vice President of Human Resources, Michael Rudman, who stated that as of October 31, 2008, the first day of the terminations, "it was very much on the cusp of whether there were fifty people or not" at the Pennsylvania facility. (Rudman Dep. at 33:20-34:12.) Mr. Rudman also testified, however, that fifty-four employees worked at the Pennsylvania facility on October 20, 2008, only eleven days before the terminations. (Rudman Dep. at 76:13-82:17.)

The Court finds that the Debtor terminated at least fifty employees at the Pennsylvania facility. SAM's evidence is not sufficient to overcome (or cast doubt on) the direct testimony of the Debtor's CEO that at least fifty full-time workers were employed at the Pennsylvania facility until October 31, 2008.

Further, under the WARN Act, if two or more groups of employees at a single site are terminated within any ninety-day period, it is considered one termination for purposes of the WARN Act, "unless the employer demonstrates that the employment losses are the result of separate and distinct actions and causes and are not an attempt by the employer to evade the requirements of [the WARN Act]." 29 U.S.C. § 2102(d). In this case, SAM acknowledges that fifty-four employees worked at the Pennsylvania facility as of October 20, 2008. Therefore, either fifty-four employees were terminated on October 31 or were terminated at

7

different times between October 20 and 31, clearly within ninety days.  SAM failed to establish any facts to demonstrate the employment losses at the Pennsylvania facility were the result of separate or distinct actions.  Consequently, the Court concludes that at least fifty employees were terminated at the Pennsylvania facility for purposes of the WARN Act.

> d.   Sixty-Day Notice Requirement

SAM concedes that same-day notice, rather than sixty-day notice, was given to the employees terminated on October 31, 2008 and November 7, 2008.  The Court, therefore, concludes that the Plaintiffs have established each of the elements of a WARN Act violation.

> C.   Single Employer Status under the WARN Act

The Plaintiffs contend that SAM and the Debtor constituted a single employer under the WARN Act.  The single employer liability test is "ultimately an inquiry into whether the two nominally separate entities operated at arm's length."  Pearson v. Component Tech. Corp., 247 F.3d 471, 495 (3d Cir. 2001).  The Third Circuit has adopted the Department of Labor ("DOL") five-factor test to determine whether a lender or parent is liable with its borrower/subsidiary as a "single employer."  Pearson, 247 F.3d at 494.  Accord Childress v. Darby Lumber, Inc., 357 F.3d 1000, 1006 (9th Cir. 2004).

The five-factor DOL test considers: (1) common ownership, (2) common directors and/or officers, (3) the de facto exercise of control, (4) unity of personnel policies emanating from a common source, and (5) the dependence of operations between the entities. See Pearson, 247 F.3d at 495. These five factors constitute a non-exhaustive list and the fact-finder may consider other evidence of entanglement. Id.

1. Common Ownership

The Plaintiffs argue that SAM indirectly owned and controlled the Debtor. The Plaintiffs also assert that SAM was indirectly a substantial lender to the Debtor.

There is no dispute about the chain of equity ownership. George Schultze and his immediate family members are 100% owners of SAM. SAM is the general partner of (and owner of 1-2% of the limited partnership interests in) Schultze Partners, LP. Schultze Partners, LP, owns approximately 37% of Schultze Master Fund, Ltd., which owns 100% of Schultze Holding Corp. which in turn owns 82% of the Capital Units of equity in Tweeter Newco, LLC ("Tweeter Newco") which finally owns 100% of the equity of the Debtor.

The Plaintiffs also contend that SAM managed and instructed various entities, namely, Schultze Master Fund, Ltd., Schultze Apex Master Fund, Ltd., and Arrow Distressed Securities Fund (the "Lenders") to lend approximately $30 million to Tweeter Newco,

9

the Debtor and the other Debtor entities.[3]  SAM holds indirect
ownership interests in Schultze Master Fund and Schultze Apex
Master Fund.

SAM responds that the Court cannot find common ownership
between SAM and Tweeter as a matter of law.  Guippone v. BH S & B
Holdings LLC, No. 09 Civ. 1029 (CM), 2010 WL 2077189, at *4
(S.D.N.Y. May 18, 2010) ("grandparent corporations are not common
owners of the subsidiaries of their subsidiaries").  SAM argues
that it is far removed from the Debtor (separated by Tweeter
Newco, Schultze Holding Corp., and Schultze Master Fund Ltd.) and
is a great-great-great grandparent at best.  Therefore, SAM
argues that Guippone precludes the Court from finding common
ownership between SAM and the Debtor.

The Plaintiffs reply that Guippone is not binding on this
Court and cite other cases where common ownership is found among
distantly related corporate affiliates, such as a great-great-
grandparent of an indirect subsidiary.  See, e.g., Richards v.
Advanced Accessory Sys., LLC, No. 09-11418, 2010 U.S. Dist. LEXIS
103613, at *15 (E.D. Mich. Sept. 30, 2010).

The Court does not agree with the holding of the Guippone
case that there is a per se rule that grandparents cannot share
common ownership with an indirect subsidiary.  As the Plaintiffs

---

[3]  The other Tweeter entities who have filed bankruptcy
petitions include Tweeter Intellectual Property, LLC, and Tweeter
Tivoli, LLC.

10

have shown, SAM has significant indirect ownership interests in the Debtor and, therefore, further inquiry is necessary.

In this case, SAM also had financial control over the Debtor through its lender relationship.  O'Brien testified that George Schultze arranged for the Lenders to pay off Wells Fargo, the former senior lender, and became "first in line as a lender." (O'Brien Dep. at 105:9-14.)  Thereafter, the Debtor's ability to use its cash collateral was "ultimately . . . George Schultze's decision.  It was his money."  (Id. at 106:5-8.)  Even Schultze's thoughts on mass terminations were important because "he's a lender of the company  . . . [and] there are costs associated with terminations, or with any plan that really you go down the road with."  (Id. at 96:18-25.)  The Lender's position enabled Schultze to make critical decisions for the Debtor and, even when he was not directly acting as the decision-maker, the Debtor felt Schultze needed to be brought "on board."  (Id. at 94:20-25.)

Financial control itself is sufficient to satisfy the common ownership factor.  See Pearson, 247 F.3d at 494 ("'financial control' will suffice to satisfy the 'common ownership' prong of the integrated enterprise test, and it is likely that the DOL factors should be interpreted similarly . . . .") (citation omitted).  SAM had financial control over the Debtor and substantial indirect ownership interests in the Debtor. Therefore, the Court finds that these factors are sufficient to

meet the first prong of the test.

     2.   Common Directors and Officers

    Neither party disputes the legal standard used to determine
whether common directors and officers exist between SAM and the
Debtor.  This factor examines whether any of the same individuals
were a part of the formal management teams of each company.  Id.
at 498 (holding that the common officers and/or directors prong
of the test should look only to whether some of the same
individuals comprise or, at some point, did comprise the formal
management team of each company).

    From June 2007 until late 2008, the boards of directors for
both Tweeter Newco and the Debtor were composed of the same five
directors: Timothy O'Brien, Carl Youngman, Julia Bykhovskaia,
George Granoff, and chairman George Schultze.  (SAM's Responses
to Pl.'s First Set of Interrogs., # 8.)  Four of the five were
connected to SAM: Julia Bykhovskaia and Timothy O'Brien worked
directly under George Schultze as analysts at SAM; Carl Youngman
served on SAM's Advisory Board; and George Schultze was the
Managing Member and 100% owner and controller of SAM.  (O'Brien
Dep. at 11:6-17, 38:3-20; Granoff Dep. at 45:4-14.)

    The Plaintiffs also contend that George Schultze was part of
the management teams at the Debtor and SAM.  SAM admits that
George Schultze acted as SAM's Managing Member.  George Schultze
held the de facto position of CEO at SAM and was the boss of all

SAM employees.  (Kelerchian Dep. at 19:22-23, 20:1-9.)  Schultze
was also the CEO and Managing Member of Tweeter Newco.  (Limited
Liability Company Agreement of Tweeter Opco, LLC, Stamped SAM
1439-43; Youngman Dep. at 39:8-24, 40:1-4, Ex. 4.)

SAM notes, however, that the Plaintiffs do not argue that
the other three directors related to SAM were formal, or even de
facto, officers or directors of SAM.  Therefore, SAM contends
that they do not meet the common directors and/or officers prong
of the test.

The Court agrees with SAM that the facts presented establish
that George Schultze is the only common director and/or officer
of the Debtor and SAM.  It is clear from the evidence that George
Schultze was CEO of Tweeter Newco for some time and was chairman
of the boards of directors for Tweeter Newco and the Debtor.  He
executed documents as Managing Member of Tweeter Newco, was
Managing Member and an owner of SAM, and de facto boss of all SAM
employees.  Thus, the Court finds that George Schultze was part
of the formal management teams of SAM and the Debtor.

Further, it is clear that Schultze and SAM controlled the
other three directors of the Debtor who were employees, or on the
advisory board, of SAM.  Therefore, the Court concludes that this
prong has been met.

### 3.    De Facto Exercise of Control

The core inquiry of the de facto exercise of control factor
is "whether the parent [or lender] has specifically directed the
allegedly illegal employment practice that forms the basis for
the litigation." Pearson, 247 F.3d at 491. See also, In re APA
Trans. Corp. Consol. Litig., 541 F.3d 233, 245 (3d Cir. 2008) (de
facto exercise of control factor looks at who was the decision-
maker responsible for the employment practice giving rise to the
litigation).

It is undisputed that on October 4, 2008, Tim O'Brien (a
director of the Debtor and SAM-employed analyst) told the then-
CEO of the Debtor, George Granoff, that George Schultze wanted
Granoff to terminate half of the Debtor's employees at the
Massachusetts corporate center.  The Plaintiffs state that this
is evidence that SAM, through George Schultze, specifically
directed the allegedly illegal employment practice of terminating
employees without following the WARN Act, which forms the basis
for this litigation.

SAM argues that this evidences only that Schultze had a
general concern for the Debtor's profitability, as an investment.
SAM supports this inference with Granoff's testimony that he
understood "half of the employees" to be a figure of speech and
that George Schultze had often suggested reductions in payroll as
a means to increase profits.  (See Granoff Dep. at 53:8-10, 14-

14

18.)

The Plaintiffs also cite an email communication from SAM employee, O'Brien, to the Debtor's employees regarding the subsequent termination of Granoff as evidence of SAM's control:

> Unfortunately this evening, we had to formally terminate George Granoff.  I have worked closely with him as I know all of you have for the past year and we at Schultze do appreciate his, as well as all of your hard work.  We all know how difficult the current operating environment is, and unfortunately due to this economic environment, coupled with the poor performance of the firm, we felt we needed tighter control of Tweeter within our own organization . . . .  I, as well as the Schultze organization, are fully dedicated to seeing what is best for all interested parties.  We will need and want your support to see this through.

(Rudman Dep. at 103:22-24, Ex. 19.)  The Plaintiffs argue that this email demonstrates that Schultze/SAM played a central role in the Debtor's employer-employee relationships, including specifically employee terminations.  They highlight the phrase "we [SAM] felt we needed tighter control" as particularly relevant to the de facto exercise of control factor.

In another email dated October 19, 2008, O'Brien stated that George Schultze was "now on board with the idea that mass terminations should be done in conjunction with understanding the WARN issue from a dollar standpoint, a formal announcement of our decided path (most likely liquidation - we will need [Wells Fargo's] support for this), a liquidator in place, security set up in the stores, etc."  (Boucher Dep. at 83:4-24, 84:1-24, 85:1, Ex. 6.)  At the time the email was sent, SAM employee O'Brien was

the sole remaining director of the Debtor.  Therefore, the Plaintiffs contend that the use of the word "our" must include George Schultze and SAM.

The Plaintiffs also note that SAM's inside general counsel, David Lurvey, was involved by O'Brien in the Debtor's affairs. O'Brien sent numerous emails regarding the Debtor's employment practices to Lurvey.  (Boucher Dep. Exs. 7-9, 11.)  Lurvey was compensated by SAM, not the Debtor, for his time.  (O'Brien Dep. at 46:21-25, 47:1-8.)  The Plaintiffs argue that this evidences that SAM (through Lurvey) was supervising O'Brien's activities at the Debtor.

The Plaintiffs also note that in 2007, Janet Kelerchian, a SAM employee, was instructed by George Schultze to meet with Tweeter's management and assist with firing some of the Debtor's employees at the Massachusetts facility.  (Kelerchian Dep. at 27:11-25, 28:1-5.)  Kelerchian was never employed by the Debtor and was compensated by SAM for her travel expenses and work, which included compiling a list of eighty employees of the Debtor to be terminated at the Massachusetts facility.  (Kelerchian Dep. at 27:20-24, 28:10-13, 33:7-24, 34:1-14.)

Two weeks prior to the October 31, 2008, terminations at issue in this case, George Schultze again instructed (and paid) Kelerchian to return to the Massachusetts facility to support O'Brien.  (Kelerchian Dep. at 36:2-10, 37:6-25, 38:1-7.)

Kelerchian testified that she returned in 2008, spent one day in
Massachusetts, attended a meeting, and spoke with employees, but
denies doing anything for or related to the Debtor while at the
Massachusetts facility in 2008.  (Kelerchian Dep. at 37:1-25, 38:
8-11.)  The Plaintiffs argue that Kelerchian's 2007 and 2008
activities demonstrate that SAM entangled itself in the Debtor's
business operations (including employee terminations) and
disregarded the legal separateness of the Debtor and SAM.

SAM disputes that it exercised _de facto_ control over the
Debtor.  SAM responds that one cannot infer a lack of arms-length
dealings between the Debtor and SAM based on Kelerchian's 2007 or
2008 activities, because she was not involved in the 2008
terminations.  SAM also argues that its involvement with the
Debtor's employment practices was sporadic and not sufficient to
establish this factor.

The Court finds that the Plaintiff has established _de facto_
control by SAM of the Debtor's employment practice.  The Granoff
termination letter evidences SAM's control over the Debtor,
especially the portion that states, "we felt we needed tighter
control of Tweeter within our own organization."  George Schultze
repeatedly called for reductions in payroll to increase profits.
Further, George Schultze ordered Kelerchian to terminate
employees of the Debtor in 2007, demonstrating his control over
the Debtor's employment practice.  With SAM employees on the

17

Debtor's board, SAM's inside counsel supervising their actions, and SAM employees directly involved with terminating employees of the Debtor, the Court finds that SAM's exercise of <u>de facto</u> control over the Debtor on the WARN Act issue was particularly egregious.  <u>See</u> <u>Pearson</u>, 247 F.3d at 504 (concluding that if the <u>de facto</u> exercise of control is "particularly egregious," then liability is warranted).

    4.   <u>Unity of Personnel Policies</u>

The fourth factor, "the unity of personnel policies emanating from a common source," is "targeted toward discerning whether the nominally separate corporations actually functioned as a single entity with respect to [personnel] policies on a regular, day-to-day basis."  <u>Pearson</u>, 247 F.3d at 490.  "[I]n reviewing the unity of personnel factor, it is proper to consider 'whether the two companies in question engaged in centralized hiring and firing, payment of wages, and personnel and benefits record keeping.'"  <u>In re Consol. Bedding, Inc.</u>, 432 B.R. 115, 122 (Bankr. D. Del. 2010) (quoting <u>APA Trans.</u>, 541 F.3d at 245).

The Plaintiffs did not directly address this factor in their motion for summary judgment, but SAM did in its motion.  SAM contends that the Debtor had its own team overseeing payroll, personnel policies and procedures, and employee issues; SAM and the Debtor did not share labor policies, hired and fired employees separately, paid employees from separate payrolls, and

18

had separate labor contracts.  SAM concedes that George Schultze interviewed the Debtor's officers, but contends that the Debtor alone was responsible for hiring decisions.

The Court finds that the Plaintiffs' evidence does not satisfy this factor.  There is no evidence that SAM and the Debtor actually functioned as a single entity with respect to personnel policies on a <u>regular, day-to-day basis</u>.  Lurvey and Kelerchian's involvement with termination of the Debtor's employees was important and relevant for the third factor under the WARN Act analysis, but was only intermittent.  Therefore, the Court concludes that this factor has not been established.

    5.   <u>Dependency of Operations</u>

The final factor, dependency of operations, "considers the general administrative structure of two related entities" and whether the two entities were "dependent" upon one another to continue operations.  <u>APA Trans.</u>, 541 F.3d at 244 n.9, 245. Courts usually consider "the sharing of administrative or purchasing services, interchanges of employees or equipment, and commingled finances." <u>Pearson</u>, 247 F.3d at 500 (citation omitted).  This factor, "by its nature, looks to the daily functioning of the two companies." <u>Id.</u> at 501 (citation omitted).

The Plaintiffs argue that O'Brien's participation in the day-to-day operations of the Debtor during the two-day transition

19

period between the firing of CEO Granoff and the hiring of
incoming CRO Boucher supports a finding of dependency of
operations.  The Plaintiffs also argue that Kelerchian's
participation in the Debtor's termination of its employees in
2007 was an interchange of employees.  The Plaintiffs finally
argue that the fact that SAM's attorney, Lurvey, read emails
regarding the Debtor's business demonstrates another interchange
of employees.

SAM argues that it did not share administrative services,
equipment, employees, or management with the Debtor and did not
have any knowledge of the Debtor's operations.  While the Debtor
owed approximately $35 million to SAM, SAM argues that all loans
were made at arms-length and were formally documented by the
Debtor's outside counsel.

The Court concludes that the Plaintiffs have not satisfied
this prong of the test.  Looking at the daily functioning of the
two companies, there is no evidence that they were dependent upon
one another to continue operations.

6.   Single Employer Conclusion

The de facto exercise of control carries special weight in
the five-factor test.  See Pearson, 247 F.3d at 504.  If the de
facto exercise of control is "particularly egregious," then
liability is warranted.  Id.  Evidence that one entity directed
another entity to act can also warrant liability.  See Pearson,

20

247 F.3d at 496.

In this case, the Court concludes that the Plaintiff has
shown common ownership, common directors and officers and the de
facto exercise of control by SAM over the Debtor.  The latter
factor was particularly egregious because SAM exercised control
over the Debtor's hiring and firing decisions, particularly those
relevant to this litigation.  Therefore, the Court will grant
summary judgment in favor of the Plaintiffs on the issue of
single employer liability.

D.   Faltering Company Defense

SAM raises the faltering company exception – a statutory
excuse for non-compliance with the sixty-day notice requirement
of the WARN Act - asserting that the Debtor had insufficient
capital to continue functioning and was thereby in a faltering
state.  See 29 U.S.C. 2102(b)(1).  The Third Circuit requires
that the Court construe the faltering company exception narrowly.
See APA Trans., 541 F.3d at 247.

The WARN Act employer must meet specific requirements to
invoke the faltering company exception.  The employer must (i)
give as much notice as is practicable and (ii) set forth specific
facts in the notice that explain the reason for reducing the
notice period.  See 29 U.S.C. § 2102(b)(3).

In a case on point, an employer provided affected employees
reduced notice, in which it stated that it "was not able to give

21

greater advance notice of this termination since this termination arises from unforeseeable business circumstances." Grimmer v. Lord Day & Lord, 937 F. Supp. 255, 256 (S.D.N.Y. 1996). The employer argued that this explained to employees why they received less than the required sixty-day notice, satisfying the substantive notification requirements of the faltering company exception. Id.

The Grimmer Court rejected this argument, holding that the employer's interpretation "robs the statutory language of content." Id. at 257. "By providing that an employer must give a brief statement of the basis for the shortened notice, Congress indicated that it intended something more than a citation to the statute or a conclusory statement summarizing the statutory provision." Id. Rather, employers must set forth specific facts that explain to workers why the shortened notice period was necessary in order to benefit from the faltering company exception. Id. See also Barnett v. Jamesway Corp. (In re Jamesway Corp.), 235 B.R. 329, 340 (Bankr. S.D.N.Y. 1999) (holding that the employer's failure to explain why it did not provide affected employees with the full sixty-day notice was "alone . . . grounds for finding that the [c]orrespondence does not provide WARN notice.").

In this case, the October 31, 2008, notices provided by the Debtor stated: "Unfortunately, due to adverse business conditions

22

outside our control, we are not able to give you advance notice."
(Rudman Dep. Exs. 13-14.)   The November 7, 2008, notices stated:
"As a result of our bankruptcy filing and the elimination of some
services to our costumers, today we are conducting a significant
reduction in our workforce and your position is directly affected
by this reduction."   (Rudman Dep. Exs. 15-16.)   The Plaintiffs
argue that these notices failed to provide the factual
circumstances that led to the reduced notification period and,
therefore, did not comply with the requirements of the WARN Act
to fit the faltering company exception.   29 U.S.C. § 2102(b)(3).

The Court agrees with the Plaintiffs.   Because the Debtor
failed to explain the reduced notification period in its
termination notice, SAM is not entitled to the faltering company
exception.   See Organogenesis, Inc. v. Andrews, 331 B.R. 500, 502
(D. Mass. 2005) ("An employer who wants to reduce the
notification period must comply with the clear statutory
requirement that the termination notice contain an explanation
for the shortened time.").

E.   Good Faith

SAM also asserts that it is entitled to the good faith
defense under the WARN Act because the Debtor provided the
termination notices in good faith.   See 29 U.S.C. § 2104(a)(4).
The Plaintiffs argue that SAM cannot raise the affirmative
defense of good faith now because it failed to raise it in its

answer.  The Plaintiffs argue that allowing SAM to raise the affirmative defense now would unfairly prejudice the Plaintiffs, as they had no meaningful opportunity to conduct discovery on facts relevant to the good faith defense.  SAM argues that it could not plead the good faith defense in its answer without admitting that it was itself an employer of the Plaintiffs.

The Court disagrees.  SAM could have raised the good faith defense in its answer, in the alternative.  Because SAM failed to raise this affirmative defense in its answer, the Court concludes it cannot raise it now.  <u>See, e.g.</u>, <u>Air Line Pilots Assoc., Int'l. v. Pan Am. Airways Corp.</u>, No. 02-593-SM, 2004 U.S. Dist. LEXIS 16776, at *4 (D.N.H. Aug. 23, 2004).


IV.  <u>CONCLUSION</u>

For the reasons set forth above, the Court will deny SAM's motion for summary judgment and grant the Plaintiffs' motion for summary judgment.

An appropriate Order is attached.


BY THE COURT:

Dated: July 8, 2011          Mary F. Walrath
                             United States Bankruptcy Judge


24